**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **FREDERICK A. SOLOMON, JR.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO. 12-00429-KD-B** |
| | * | |
| **CAROLYN W. COLVIN,**[1] | * | |
| **Commissioner of Social Security,** | * | |
| | * | |
| **Defendant.** | * | |

## REPORT AND RECOMMENDATION

Frederick A. Solomon, Jr. ("Plaintiff"), brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for childhood disability insurance benefits (CIB) under §§ 202(d) and 216(e) of the Act, 42 U.S.C. §§ 402(d), 416(e). This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  Upon consideration of the administrative record and memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.[2]

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Oral argument was scheduled for June 6, 2013; however, at the parties' request, oral argument was cancelled.

## I.      <u>Procedural History</u>

In March of 2009, Plaintiff protectively filed applications for childhood insurance benefits based on disability under §§ 202(d) and 216(e) of the Act, 42 U.S.C. §§ 402(d), 416(e), and supplemental security income (SSI) under §§ 1602 and 1614(a)(3)(A) of Title XVI of the Act, 42 U.S.C. § 1381a.[3]  (Tr. 216-18).  Plaintiff alleged disability beginning January 1, 2004, prior to age twenty-two, based on attention deficit disorder (ADD), learning disorder, obesity, and mental illness.  (<u>Id.</u> at 234).  Plaintiff's applications were denied at the initial stage, and he filed a timely Request for Hearing.  The hearing was held on November 17, 2010, before Administrative Law Judge D. Burgess Stalley (hereinafter "ALJ").  (<u>Id.</u> at 82-94).  The hearing was attended by Plaintiff, his mother, Mildred Horn, his attorney, Brooke Thomas, and a vocational expert ("VE").   (<u>Id.</u> at 82).  On December 10, 2010, the ALJ issued a partially favorable decision. With respect to Plaintiff's claim for SSI, the ALJ found that Plaintiff "has been disabled under §1614(a)(3)(A) of the Social Security Act beginning on March 1, 2008."[4] (<u>Id.</u> at 26).  However, with respect to Plaintiff's applications for CIB filed in March 2009, the ALJ found that Plaintiff "has not been disabled under § 223(d) of the Social Security Act" because he turned twenty-two prior to March 1, 2008, the established onset date for his severe

---

[3] The record does not contain a copy of Plaintiff's applications for childhood disability insurance benefits but does contain a copy of Plaintiff's application for supplemental security income.  (Tr. at 216).

[4] The ALJ found that Plaintiff was disabled as of March 1, 2008, as a result of the severe impairment of paranoid schizophrenia, which met the criteria of section 12.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. at 22).

impairment of paranoid schizophrenia.  (Id. at 14, 26).  Plaintiff requested review of the ALJ's

decision by the Appeals Council.  (Id. at 5).  On May 1, 2012, the Appeals Council denied

Plaintiff's request and affirmed the ALJ's decision (id. at 1), making it the Commissioner's

final decision for purposes of review.  See 20 C.F.R. § 422.210(a).

The parties agree that this case is now ripe for judicial review and is properly before this

Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.**     **Issue on Appeal**

A.     Whether the ALJ erred in rejecting the opinion of Plaintiff's
treating physician?

**III.**    **Factual Background**

Plaintiff was born on May 19, 1982, and was twenty-eight years old at the time of his

hearing on November 17, 2010.  (Tr. at 87; Doc. 8 at 1).  At that time, Plaintiff had been

diagnosed with seizure disorder, sleep apnea, panic attacks, attention deficit disorder (ADD),

learning disorder, obesity, and paranoid schizophrenia.[5]  (Id. at 402, 476-78).

Plaintiff repeated second grade, and was diagnosed with ADD and a learning disorder

while in elementary school.  (Id. at 294).  In high school, Plaintiff attended regular classes,

maintained average and above average grades, and was recognized by his teachers as

---

[5] On appeal to this Court, Plaintiff does not challenge the ALJ's findings related to his paranoid
schizophrenia, nor does he discuss that illness. (Doc. 8 at 4).  Rather, Plaintiff seeks review only
of the ALJ's finding that he was not disabled prior to age twenty-two as a result of his other
impairments, *i.e.*, seizure disorder, sleep apnea, panic attacks, ADD, learning disorder, and
obesity. (Doc. 8).  The Court discusses Plaintiff's paranoid schizophrenia where necessary for
purposes of background and clarity.

"exceptional" and a "leader." (Id. at 286, 294).  Following high school, Plaintiff attended Alabama A&M on a football scholarship. (Id. at 294, 371).

In November of 2003, at age twenty-one, Plaintiff suffered a seizure and reported that he had gotten "a pretty good shot to his head during" a recent football game. (Id. at 371).  Plaintiff was hospitalized and placed on seizure medication. (Id. at 364).  His medical records reflect that he also experienced possible panic attacks and sleep apnea during that time. (Id. at 366, 371). Following his seizure, Plaintiff continued to play football at Alabama A&M and had no reoccurrence of seizure activity. (Id. at 398).  Plaintiff was taken off of seizure medication in July 2005. (Id.).

Throughout 2001-2008, Plaintiff had a work study job at Alabama A&M as an assistant answering phones, typing, and copying papers. (Id. at 235).  He was described by one of his college professors as "a dedicated student, who displayed an outgoing, pleasant, and enthusiastic personality." (Id. at 320).  The professor noted that Plaintiff was "in good academic standing," was "a successful athlete," and was "well liked and respected by his teammates as well as his classmates, faculty, and staff." (Id.).  In May of 2005, at age twenty-three, Plaintiff graduated with honors from Alabama A&M University with a bachelor's degree in business. (Id. at 300, 320).

In the fall of 2005, Plaintiff enrolled in the M.Ed. program in Business/Marketing Education at Alabama A&M. (Id. at 320).  In March of 2008, at age twenty-five, Plaintiff began missing his graduate classes. (Id. at 320).  At the time, Plaintiff was one semester shy of earning a graduate degree. (Id. at 477).  His professors and other school officials contacted his mother

and informed her that Plaintiff was experiencing some type of mental disorder. (Id. at 89, 320). Plaintiff refused medical treatment; thus, his mother instituted commitment proceedings. (Id. at 89, 424). In July of 2008, Plaintiff was hospitalized in Huntsville Hospital for psychiatric treatment. He was diagnosed with psychotic disorder, NOS, rule out paranoid schizophrenia. (Id. at 89, 424-26). Because of his symptoms of schizophrenia, he was forced to withdraw from school. (Id. at 91, 320, 477).

In August of 2010, Plaintiff was again involuntarily committed for psychiatric treatment at Alta Pointe and Searcy Hospital. (Id. at 89, 476-78, 497-98). At that time, he was diagnosed with paranoid schizophrenia. (Id. at 478, 498). Plaintiff remains under the care of a psychiatrist and neurologist for paranoid schizophrenia. (Id. at 89).

At the administrative hearing conducted on November 17, 2010, Plaintiff's mother testified that Plaintiff began "hearing things and having problems associating and communicating with people" in November of 2007,[6] and in 2008, he moved in with her and began treatment for his mental disorder. (Id. at 89, 91). Plaintiff's mother further testified that he continues to live with her and essentially has no activities. (Id. at 88). According to Plaintiff's mother, Plaintiff will sometimes go to the store for her, but generally he stays in his bedroom and watches television. (Id.).

---

[6] At the hearing, Plaintiff's mother testified that Plaintiff was diagnosed with "these symptoms and conditions" when he was in the sixth grade and then in 2001, "it escalated." (Tr. at 90). She testified that an attorney advised her not to seek Social Security benefits at that time but to seek accommodations for Plaintiff through the school system and the State, which she did. (Id. at 91). It appears that Plaintiff's mother was referring to his ADD and learning disorder.

## IV.   Analysis

### A.   Standard Of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[7]   Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").   In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. 1999).

### B.   Discussion

This matter involves an application for childhood disability insurance benefits under §§

---

[7] This Court's review of the Commissioner's application of legal principles is plenary.  See Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

202(d) and 216(e) of the Act, 42 U.S.C. §§ 402(d), 416(e).  In order to receive CIB as a disabled adult, a claimant must show that he is the child of an individual who is entitled to old-age or disability insurance benefits and is dependent on the insured, is unmarried, and was under a disability as defined in the Act that began before he attained the age of twenty-two.  See 42 U.S.C. §§ 402(d)(1), 423(d)(1)(A); 20 C.F.R. § 404.350; see also Gafford v. Astrue, 2011 U.S. Dist. LEXIS 83217, *2-3, 2011 WL 3209087, *1 (M.D. Ala. July 28, 2011).

Here, the only issue is whether Plaintiff was under a disability that began before the age of twenty-two.  As noted above, Plaintiff does not maintain that he was disabled from paranoid schizophrenia prior to the age of twenty-two.[8]  (Doc. 8).  Rather, Plaintiff maintains only that he was disabled as a result of his other impairments (i.e., seizure disorder, sleep apnea, panic attacks, attention deficit disorder, learning disorder, and obesity) prior to age twenty-two.  Therefore, the Court will consider the ALJ's findings and the medical evidence related to those impairments.

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five step sequential evaluation process for determining

---

[8] The ALJ established the onset date for Plaintiff's paranoid schizophrenia to be March 1, 2008. (Tr. at 22).

whether an individual is disabled.[9]  20 C.F.R. §§ 404.1520, 416.920.

### 1. ALJ's Decision

In the case *sub judice*, the ALJ issued a partially favorable decision.  The ALJ found that Plaintiff became disabled on March 1, 2008, at age twenty-five, as a result of the severe mental impairment of paranoid schizophrenia, which met Listing 12.03.  (Tr. at 22, 26).  Thus, the ALJ concluded that Plaintiff is entitled to SSI benefits beginning that date.  (Id.).  The ALJ denied Plaintiff's application for childhood disability insurance benefits, however, because Plaintiff turned twenty-two *prior* to the established onset date of March 1, 2008.  (Id. at 26).

The ALJ specifically found that prior to March 1, 2008, Plaintiff had the medically determinable impairments of history of seizure, history of sleep apnea, history of panic attacks, ADD, learning disorder, and obesity; however, none of these impairments, singularly or in

---

[9] The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

combination, significantly limited Plaintiff's ability to perform basic work-related activities for twelve consecutive months.  (Id. at 16).  Therefore, the ALJ concluded that because Plaintiff did not have a severe impairment or combination of impairments prior to March 1, 2008 (when he developed schizophrenia), he was not disabled prior to that date.  (Id. at 16-17, 26).

### 2. Record Evidence

The relevant medical evidence of record shows that on November 28, 2003, when Plaintiff was twenty-one years old, he suffered a seizure and was taken to the emergency room at Mobile Infirmary.[10]  (Id. at 364).  Plaintiff reported that he had taken a "shot to the head" during a recent football game.  (Id. at 371).  The results of a CT scan of Plaintiff's brain were normal (id. at 379), and an MRI showed only a "[t]iny signal abnormality . . . felt to be artifact," with no evidence of aneurysm, arteriovenous malformation, or focal stenosis.  (Id. at 385-86).  Plaintiff was diagnosed with a "resolving seizure" and "possible sleep apnea."  (Id. at 364, 366, 371).  Plaintiff's mother reported her belief that Plaintiff also suffers from panic attacks.  (Id. at 371).  While in the hospital, Plaintiff was seen by a neurologist, Dr. C. Scott Markle, who prescribed Dilantin (an anti-seizure medication).  (Id. at 367, 369-70).  On November 30, 2003, Plaintiff was discharged with instructions to follow up with Dr. Markle and to take his medication.  (Id. at 364).

On December 12, 2003, Plaintiff  had a follow-up visit with Dr. Markle.   Dr. Markle noted that Plaintiff "has had no more seizures since being on the Dilantin."  (Id. at 468).  Dr.

---

[10] Plaintiff's medical records note that he "ha[d] never been known to have seizures before."  (Tr. at 369).

Markle also noted reports by Plaintiff's mother of behavior that sounded like panic attacks (*i.e.*, shortness of breath and hyperventilation).  (Id.).  Dr. Markle's physical examination of Plaintiff was normal, except that Plaintiff was slightly lethargic.  (Id.).  Dr. Markle noted that Plaintiff "is making good grades in college."  (Id.).  Dr. Markle continued Plaintiff's seizure medication and noted that Plaintiff "does not want to go on any medicine for panic disorder. . . . He says this is not bothersome to him."   (Id.).

Plaintiff returned to college and on March 8, 2004, Dr. Markle wrote Plaintiff a doctor's excuse for missing two days of classes.  In the note, Dr. Markle advised that "Mr. Solomon is a patient of mine and because of medicine I have him on which can cause sedation he missed class Feb. 27th & March 1st.  Please excuse him for those absences." (Id. at 467).

On May 26, 2004, one week after Plaintiff's twenty-second birthday, Plaintiff saw Dr. Markle for a follow up examination.  Dr. Markle's  notes reflect that Plaintiff was "doing better on the Trileptal than he was with the Dilantin.  He is not having as much lethargy." (Id. at 402). Dr. Markle also noted, "[h]e is out for the summer now.  He did fairly well in school and got 3 A's, 2 B's and 1 C.  He is due back to practice football in August." (Id.).  The results of Dr. Markle's physical examination of Plaintiff were normal except for a rash.  (Id.).  Dr. Markle continued Plaintiff's Trileptal and advised him to follow up in six months.  (Id.).

Dr. Markle's treatment records dated January 4, 2005 and March 23, 2005, reflect that Plaintiff was doing well and had experienced no further seizures.  (Tr. at 400-01).  The results of a follow up MRI taken on January 7, 2005, were normal, specifically stating: "no abnormal signal seen within the brain." (Id. at 403).

10

On June 20, 2005, at age twenty-three, Plaintiff was tested for sleep apnea by Dr. Lawrence Sindel.  Dr. Sindel diagnosed Plaintiff's sleep apnea as "mild overall, severe in REM" and recommended a CPAP trial and possible ENT evaluation.  (Id. at 397).

Dr. Markle's  treatment notes dated July 27, 2005 likewise reflect that Plaintiff's sleep apnea had been confirmed by a sleep test but that Plaintiff "does not want to wear the C-PAP." According to Dr. Markle, Plaintiff had one more year of football, after which Plaintiff planned to lose weight to help with his sleep apnea.  (Id. at 398).  The notes further reflect that Plaintiff's physical examination was normal, and "[a]s far as the seizures, [Plaintiff] has only had one seizure and it has been almost two years so he can stay off the Trileptal."  (Id.).

On August 29, 2007, at the age of twenty-five, Plaintiff presented to the emergency department of Huntsville Hospital with complaints of groin pain.  (Id. at 410).  CT results from scans of Plaintiff's abdomen and pelvis were normal.  (Id. at 417).  Plaintiff again presented to Huntsville Hospital on October 16, 2007, with complaints of abdominal pain.  (Id. at 422).  The results of an abdominal ultrasound were normal.  (Id.).

On July 7, 2008, at age twenty-six, Plaintiff was admitted to Huntsville Hospital pursuant to an involuntary commitment after he began acting increasingly paranoid and delusional.[11]  (Id.

---

[11] Dr. Tarak Vasavada's notes state:

> [P]atient has been acting in an increasingly paranoid and delusional manner since Christmas or Thanksgiving time frame. Patient complaints (sic) of bombs going off, house shaking, started sleeping in a helmet.  He believes his phone is bugged or possessed.  He refused to drive his car because he believes it is possessed. . . . Patient states he does have a ticket to Barbados and

(Continued)

11

at 428-29).  At that time, Dr. Tarak Vasavada diagnosed Plaintiff with psychotic disorder NOS, rule out bipolar disorder with psychotic features.  (Id. at 424).   Plaintiff's physical examination was normal.  (Id. at 426, 429).  A CT scan of Plaintiff's head was normal.  (Id. at 434).  Plaintiff was placed on Invega and discharged on July 14, 2008, with instructions to take his medication daily and follow up with a local mental health center.  (Id. at 424).

On April 29, 2010, Dr. Markle wrote a letter stating that Plaintiff was "suffering from severe delusions with significant psychiatric disorder," and opined that, for that reason, "he is unable to work."   (Id. at 466).  Dr. Markle stated, "I do not feel from a neurologic standpoint that he is capable of working given his significant psychiatric disorder." (Id.).

On August 4, 2010, when Plaintiff was twenty-eight years old, he was involuntarily hospitalized again at Altapointe Health Systems.  (Id. at 476).  Dr. Florin Ghelmez diagnosed Plaintiff with paranoid schizophrenia.  (Id. at 478).  Plaintiff's admission records indicate that he "was one semester away from graduating college. . . [and] became psychotic after that and quit school."  (Id. at 477).  The medical records reflect that Plaintiff  was transferred from Altapointe on August 11, 2010, to Searcy Hospital for long term treatment.  (Id. at 476-77).   Plaintiff was discharged from Searcy on September 3, 2010 with a "guarded" prognosis.  (Id. at 498-99).

During Plaintiff's September 8, 2010 visit with Dr. Markle, Dr. Markle noted that

---

plans to leave the country.  He keeps asking for a consulate because his human rights not his US Citizen rights but his human rights have been violated.

(Tr. at 428).

Plaintiff had a history of "a one time seizure with no recurrence," and "sleep apnea." (Id. at 515). Dr. Markle commented that Plaintiff was "currently pleasant… [and] not delusional like he was before." (Id.). His physical examination was normal, except that Plaintiff had gained weight, going from the 270's to 335 pounds. (Id.). Dr. Markle gave Plaintiff his Invega injection and talked to him about losing weight. (Id. at 516).

On October 1, 2010, Plaintiff saw Dr. John Cranton for a psychiatric evaluation, upon referral by Dr. Markle. (Id. at 510). Dr. Cranton noted that Plaintiff had a history of "a one time seizure with no recurrence" and a "history of sleep apnea," although "he doesn't want to use the CPAP machine." (Id. at 510-11). Dr. Cranton noted that Plaintiff had a tendency to overeat although he had been losing weight recently. (Id. at 510). Dr. Cranton diagnosed Plaintiff with "probable major depressive disorder with psychosis, rule out depressed phase of a bipolar II disorder, rule out schizophrenia." (Id. at 511). He continued Plaintiff's medications (Invega injections and Lexapro) and suggested that Plaintiff use the "tennis ball T-shirt method to help prevent him from rolling over on his back while asleep." (Id.).

On October 19, 2010, Plaintiff returned to Dr. Markle for a follow up examination, and Dr. Markle noted that Plaintiff was seeing Dr. Cranton and that Plaintiff was having trouble getting his Invega injections. (Id. at 514). Dr. Markle noted that Plaintiff's physical examination was normal, although he needed to lose weight. (Id.). Dr. Markle expressed concern that Plaintiff had not gotten his Invega injection and prescribed Seroquel until he could get the Invega. (Id.).

The record reflects that on October 21, 2010, Plaintiff had a follow-visit with Dr.

Cranton, who noted that Plaintiff was "doing about the same." (Id. at 509). Dr. Cranton also noted that Plaintiff was taking the Invega injections but having difficulty because of the cost. (Id at 509.). Dr. Cranton also noted that Plaintiff was not using the tennis ball method of controlling his sleep apnea, and he was still overweight. (Id.).

On November 10, 2010, Plaintiff saw Dr. Markle for a follow up examination. Dr. Markle noted that Plaintiff was "cheerful" and "cooperative," that his weight was down to 328 pounds, and that his physical examination was normal. (Id. at 512). At that time, Dr. Markle completed a Mental Residual Functional Capacity (RFC) Assessment for Plaintiff. He opined that Plaintiff had moderate restriction of activities of daily living; moderate difficulty in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely and appropriate manner; and four or more expected episodes of decomposition. (Id. at 495). In addition, Dr. Markle opined that Plaintiff had a moderate restriction in the ability to understand, carry out, and remember instructions, as well as in the ability to respond appropriately to co-workers, and in the ability to complete work related activities in a normal workday. (Id. at 495-96). Dr. Markle further found that Plaintiff had an extreme restriction in the ability to respond appropriately to customary work pressures. (Id. at 496). In all other listed areas of functioning, Dr. Markle found only that Plaintiff was mildly restricted or not restricted at all. (Id.). Finally, Dr. Markle indicated that the earliest date that Plaintiff had the noted limitations was March 30, 2001. (Id.).

On November 15, 2010, Plaintiff was seen by Dr. Markle, who noted that Plaintiff was doing well on his medications and that he "has had no seizures." (Id. at 513). Plaintiff's

physical examination was normal, although his weight was up to 337 pounds. Plaintiff was continued on his medications and instructed to return in six weeks. (Id. at 513).

### 3. Whether the ALJ erred in rejecting the opinion of Plaintiff's treating physician?

Plaintiff seeks review of the ALJ's denial of his application for CIB. (Doc. 8 at 4). In his brief, Plaintiff argues that his disability began as early as March 30, 2001, when he was eighteen years old. (Id. at 1, 5). In making this argument, Plaintiff does not contend that he was disabled as a result of his paranoid schizophrenia prior to his twenty-second birthday (on May 19, 2004).[12] (Doc. 8 at 1, 4-5). Instead, Plaintiff argues that he was disabled as a result of his *other* medical conditions (*i.e.*, seizure disorder, sleep apnea, panic attacks, ADD, learning disorder, and obesity) (hereinafter "*other*" impairments) prior to the age of twenty-two. (Id. at 4-5).

In this case, the ALJ found that prior to March 1, 2008 (the onset date for Plaintiff's disabling paranoid schizophrenia), Plaintiff had the following *non-severe* impairments:[13] history

---

[12] Plaintiff does not challenge the ALJ's established onset date for his paranoid schizophrenia as March 1, 2008. (Doc. 8 at 2).

[13] Social Security Ruling (SSR) 96-3p provides that, "[a]t step two of the sequential evaluation process, an impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." 1996 SSR LEXIS 10, 1996 WL 374181. A "severe" impairment must last or be expected to last for a continuous period of at least 12 months. See 20 C.F.R. § 404.1520(a)(4)(ii), (c) (requiring presence of a severe medically determinable impairment(s) that meets the duration requirement in 20 C.F.R. § 404.1509). It is the claimant's burden to show he has a "severe" impairment or combination of impairments. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). Basic work activities mean the abilities and aptitudes necessary to do most jobs and include: 1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; 2) capacities
(Continued)

of seizure, history of sleep apnea, history of panic attacks, ADD, learning disorder, and obesity. (Tr. at 16-17). The ALJ found that none of these impairments significantly limited Plaintiff's ability to perform basic work-related activities for twelve consecutive months; thus, they were not severe.[14] (Id.). Plaintiff argues that the ALJ erred in finding his *other* impairments to be non-severe. (Doc. 8 at 2). More precisely, Plaintiff argues that the ALJ erred in improperly rejecting the opinion of his treating physician, Dr. Markle, in the mental RFC assessment, that Plaintiff's limitations and restrictions[15] began as early as March 30, 2001. (Id. at 4).

The ALJ's decision reflects that he assigned great weight to Dr. Markle's treatment records and portions of his mental RFC assessment regarding the existence and severity of Plaintiff's limitations and restrictions. (Tr. at 24-25). However, the ALJ assigned no weight to the portion of Dr. Markle's opinion in which he stated that Plaintiff's symptoms and limitations began on March 30, 2001, because he determined that the opinion "is inconsistent with the medical evidence of record" and "quite conclusory." (Id. at 25). The ALJ found no evidence

---

for seeing, hearing, and speaking; 3) the ability to understand, carry out, and remember simple instructions; 4) the ability to use judgment; 5) the ability to respond appropriately to supervision, coworkers, and unusual work situations; and 6) the ability to deal with changes in a routine work setting. See 20 C.F.R. § 404.1521(b).

[14] The ALJ specifically found that Plaintiff's "medically determinable mental impairments" (ADD and learning disorder) were non-severe because they caused no more than a mild limitation in Plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace, and caused no episodes of decompensation. (Tr. at 21-22).

[15] As discussed above, Dr. Markle found that Plaintiff had significant functional limitations and deficiencies in several areas, rating Plaintiff's limitations as "extreme" in one area, "moderate" in five other areas, and "frequent" in another. (Tr. at 495-96).

16

that Plaintiff received medical treatment for what she considered to be his only his disabling medical condition (*i.e.*, paranoid schizophrenia) until July of 2008.  Thus, the ALJ afforded "no weight" to Dr. Markle's opinion that Plaintiff's limitations commenced in 2001.  (Id.).  Upon review, the Court finds that the ALJ did not err in rejecting Dr. Markle's opinion regarding the onset date of Plaintiff's disability, and that the ALJ's finding is supported by substantial evidence.

"It is well-established that the testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary."  Crawford v. Commissioner of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (citations and internal quotations omitted). The ALJ may discount the treating physician's report where it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by the physician's own record or other objective medical evidence.  Id.; see also Green v. Social Sec. Admin., 223 Fed. Appx. 915, 922-23 (11th Cir. 2007) (unpublished) (ALJ had good cause to devalue a treating physician's opinion where it was inconsistent with the medical evidence and plaintiff's testimony).  "When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the: (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence and explanation supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the pertinent medical issues; and (6) other factors that tend to support or contradict the opinion."  Weekley v. Commissioner of Soc. Sec., 486 Fed. Appx. 806, 808 (11th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)).  When an ALJ articulates specific reasons for declining to give

17

a treating physician's opinion controlling weight, and the reasons are supported by substantial evidence, there is no reversible error.  See Forrester v. Commissioner of Social Sec., 455 Fed. Appx. 899, 902 (11th Cir. 2012) (unpublished).  Indeed, an ALJ "may reject any medical opinion, if the evidence supports a contrary finding."  Id., 455 Fed. Appx. at 901.  Although the ALJ must evaluate the treating physician's opinion "in light of the other evidence presented," "the ultimate determination of disability is reserved for the ALJ."  Green, 223 Fed. Appx. at 922-23 (citing 20 C.F.R. §§ 404.1513, 404.1527, 404.1545)).

The Court has reviewed the record at length and finds no evidence to support Dr. Markle's opinion that *any* of Plaintiff's impairments (whether paranoid schizophrenia[16] or any other impairment) either singularly or in combination became disabling as early as March 30, 2001 or at any time prior to Plaintiff's twenty-second birthday on May 19, 2004.  With respect to Plaintiff's history of seizures, his medical records show that he was treated by Dr. Markle in November of 2003, at the age of twenty-one, for an isolated seizure.  (Id. at 364).  Dr. Markle placed Plaintiff on seizure medication at that time and then discontinued the medication in 2005 because there had been no recurrence or problems whatsoever.  (Id. at 367, 369, 398, 400).  Plaintiff's treatment records document that he "ha[d] never been known to have seizures before" the one that he had in 2003, and he never had one again.  (Id. at 369, 400-01, 468, 510, 513, 515).

---

[16] While the ALJ's findings related to Plaintiff's paranoid schizophrenia are not at issue in this case, the Court's has determined that the ALJ's findings with respect to that impairment are supported by the substantial evidence in this case.

18

With respect to Plaintiff's sleep apnea, his medical records show that he was diagnosed with possible sleep apnea in November of 2003, when he was twenty-one years old.  (Id. at 366, 371).  In June of 2005, when Plaintiff was twenty-three years old, his sleep apnea was confirmed by Dr. Lawrence Sindel, who diagnosed his condition as "mild overall, severe in REM" and recommended a CPAP trial and a possible ENT evaluation.  (Id. at 397).  However, Plaintiff declined all treatment for sleep apnea, including wearing a C-PAP and using "the tennis ball method."  (Id. at 398, 509-11).

With respect to Plaintiff's history of panic attacks, Plaintiff's medical records show that on November 28, 2003, when Plaintiff was twenty-one years old, his mother reported behavior by Plaintiff that she believed to be panic attacks (i.e., shortness of breath and hyperventilation).  (Id. at 371, 398, 468).  However, in December of 2003, Plaintiff told Dr. Markle that he did "not want to go on any medicine for panic disorder" because the condition was "not bothersome to him."  (Id. at 468).  It does not appear that Plaintiff was ever treated for this condition.

With respect to Plaintiff's ADD and learning disorder, Plaintiff's medical records show that he was diagnosed in the second grade with ADD and a reading disorder.  (Id. at 294). However, there is no indication that Plaintiff was taking medication for these conditions when he entered high school.  Plaintiff's records show that he was enrolled in regular classes in high school and maintained average and above average grades.  (Id. at 285-86).  He was described by his high school teachers as  "exceptional" and a "leader."  (Id. at 286).  In 2001, when he was nineteen years old, Plaintiff attended Alabama A&M University on a football scholarship and

graduated with honors in 2005, at the age of twenty-three, with a bachelor's degree in business.[17] (Id. at 294, 320, 371).   Plaintiff's professors described him as "dedicated," "outgoing," "pleasant," "enthusiastic," "successful," "well liked" and "respected by his teammates as well as his classmates, faculty, and staff."   (Id. at 320).   There is no evidence that Plaintiff was significantly limited in any respect by either of these conditions.

With respect to Plaintiff's obesity, his medical records show that his history of "obesity" has been regularly noted in his medical records.   However, there is no indication that any significant treatment has ever been recommended, nor has any physician ever suggested that Plaintiff was limited in any way as a result of his weight.   To the contrary, his records show that in August of 2001, when he was in high school, he was playing football, running three times a day, and working out regularly with weights, despite the fact that he weighed over 300 pounds. (Id. at 294).   From 2001 to 2005 (age nineteen to twenty-three), Plaintiff played football in college while consistently maintaining his weight around 300 pounds.   (Id. at 320, 371, 381, 398).   In November of 2003 (at age twenty-one), when Plaintiff was treated for his one-time seizure, which he attributed to a hit sustained while playing football, Dr. Markle noted that although Plaintiff was acutely ill from the seizure, he was otherwise "in excellent general health."   (Id. at 382).   This evidence belies the assertion that Plaintiff was significantly limited in

---

[17] Upon graduating with his bachelor's degree in 2005, Plaintiff immediately enrolled in the M.Ed. program in Business/Marketing Education at Alabama A&M.   (Id. at 320).   He resigned from school in March of 2008, when he was one semester away from graduating with his Master's degree, due to the onset of symptoms from paranoid schizophrenia.   (Tr. at 91, 320, 477).

any way by this medical condition.

Without question, Plaintiff's medical records demonstrate that, regardless of the impairment(s) to which Dr. Markle was referring in his Mental RFC Assessment, his opinion about the onset date of Plaintiff's limitations is inconsistent with his own treatment records, as well as the other medical evidence in this case. Thus, as the ALJ concluded, it is entitled to no weight.

Moreover, having reviewed all of the evidence in this case, the Court finds no support for Plaintiff's assertion of disability prior to his twenty-second birthday (on May 19, 2004). To the contrary, the Court finds that the substantial evidence in this case supports the ALJ's finding that Plaintiff's history of seizure, history of sleep apnea, history of panic attacks, ADD, learning disorder, and obesity, are non-severe and that Plaintiff was not disabled as a result of these, or any impairment, prior to his twenty-second birthday. Thus, the ALJ correctly denied Plaintiff's application for childhood disability insurance benefits under the Act.

## V.    Conclusion

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **RECOMMENDED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for childhood disability insurance benefits be **AFFIRMED**.

### Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within

fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

      **DONE** this **27th** day of **June, 2013.**

                                                    /s/  **SONJA F. BIVINS**
                                         **UNITED STATES MAGISTRATE JUDGE**